**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA

v.

JERMAINE SHELTON,

Defendant.

**REPORT AND**
**RECOMMENDATION**
14-CR-6009

## Procedural Background

On January 16, 2014, defendant Jermaine Shelton was indicted on one count of being a felon in possession of a firearm. See Indictment (Docket # 6). That same date, the Hon. Frank P. Geraci, Jr., referred all pretrial motions to this Court pursuant to 28 U.S.C. § 636(b)(1)(A)—(B). See Docket #7. Currently before the Court is a motion by the defendant to suppress the firearm found in a search on June 21, 2013. See Docket # 25.

The Government has filed papers in opposition to the motion. See Docket # 26. In opposing suppression, the Government argues that the defendant lacks standing to contest the search of the residence where the firearm at issue was found and seized. See Government's Response to Defendant's Pre-Trial Motions (Docket # 26) at 3. Because the issue of whether the defendant had a reasonable expectation of privacy in the premises searched would be dispositive on the merits of the motion to suppress, the Court convened a hearing on the issue of standing. The hearing began on July 29, 2014 and concluded on

1

August 4, 2014.[1]  After completion of the hearing, both the Government and defense counsel filed supplemental briefs.  See Docket ## 39, 42, 45.

## Findings of Fact

On the issue of standing, the Government presented two witnesses at the hearing.  The first witness was George Martin, United States Probation Officer and a Supervisor in the Post-Sentence Supervision Unit.  Mr. Martin testified that in May 2013, Jermaine Shelton began a two-year term of supervised release.  Tr. 8—10.  Mr. Martin assigned United States Probation Officer Jeffrey Mileham as Mr. Shelton's supervising officer.  Id.  Mr. Martin testified that as a supervisor at the Probation Office, he had access to monthly supervision reports in which the defendant was required to disclose his place of residence.  Tr. 10—11.  On June 3, 2013, the defendant completed a monthly supervision report and listed "152 Hampton Boulevard, Rochester, New York, 14612" as his residential address.  Tr. 13—15.  The defendant gave no indication of a secondary address.  Id.; see also Government Exhibit 14.  Mr. Martin testified that Mr. Shelton did not advise the probation department of any change in his residence or any secondary place of residence prior to his arrest on June 21, 2013.  Tr. 16—17.

---

[1] Citation pagination is based on the combined hearing transcript of July 29, 2014 and of August 4, 2014.  See Docket ## 34 and 35.

The Government's second witness was Shanté Wallace.  Ms. Wallace testified that she had known the defendant for four and a half years, and they had two children together.  Tr. 24.  Ms. Wallace stated that in June 2013, she was living at 597 Sawyer Street with the defendant and their children.  Tr. 24—26; see also Government Exhibit 1.  Ms. Wallace leased the Sawyer Street residence as part of a subsidized "Section 8" lease agreement.  Tr. 27.  She testified that when she signed the lease agreement in February 2011, the defendant's name was not included on the lease and had never been added to the lease. Tr. 26—27.  According to Ms. Wallace, the defendant did not ordinarily contribute to the rental payments, although he did pay bills for telephone service, internet service, and a monthly Netflix subscription.  Tr. 26—28, 103.  On cross-examination, Ms. Wallace testified that on one occasion Mr. Shelton contributed some funds when Ms. Wallace fell behind in her Section 8 rent payments and that he also received some mail at her residence.  Tr. 73—74.  Ms. Wallace stated that when she first rented 597 Sawyer Street, she was given two keys to the residence, one of which she kept for herself and the other of which she gave to the defendant.  Tr. 69.  Ms. Wallace testified that she lost her own key and eventually took the defendant's key to the residence off of his keychain.  Tr. 69—71.  Despite the lack of a key, the defendant continued to reside at 597 Sawyer Street. Tr. 71.  Ms. Wallace eventually lost the second key to her home, and

3

as of June 21, 2013, neither Ms. Wallace nor the defendant had a physical key to the Sawyer Street residence. Tr. 71—72.

As to how their relationship impacted their living arrangements, Ms. Wallace described periods of time when she demanded the defendant move out, albeit temporarily. Tr. 95. Ms. Wallace was adamant that it was her decision whether the defendant stayed at the residence. Tr. 27. Ms. Wallace testified that on multiple occasions she told the defendant to leave the residence and he complied. Tr. 27, 95. Ms. Wallace stated that the defendant had never asked her to leave, and according to Ms. Wallace, the defendant lacked the authority to exclude her from the residence. Tr. 89—90. Ms. Wallace testified that the defendant needed her permission to be in the residence, and whenever she demanded the defendant leave, he would pack up his clothes and other necessities and leave the house with them. Id. Ms. Wallace testified these sorts of arguments happened "[m]aybe a couple times a month." Tr. 95. According to Ms. Wallace, "we would get into it and he would leave and he would come back," often the next day. Id. However, Ms. Wallace insisted that it was her apartment and she had the authority to tell the defendant whether or not he could stay there. Tr. 30.

The defendant was incarcerated from November 2012 to May 2013. Tr. 27—29. Upon his release, and with the permission of Ms. Wallace, the defendant returned to reside with her at 597 Sawyer Street. Id.

4

Ms. Wallace stated that she was aware that Mr. Shelton was on federal supervised release, and he informed her that he told his probation officer that his primary residence was with his sister at 152 Hampton Boulevard in the City of Rochester. Tr. 29—30.

On Monday, June 17, 2013, Mr. Shelton and Ms. Wallace got into an argument, and Ms. Wallace once again demanded that the defendant leave her Sawyer Street home. Tr. 32. The defendant left and, according to Ms. Wallace, took with him "the majority of his clothes." Id. Ms. Wallace testified her mother came to her home and supervised the defendant's exit from her residence "to make sure everything was okay." Id. By Wednesday, Ms. Wallace gave the defendant permission to return to her residence. Tr. 33—34. Ms. Wallace testified that on the evening of Thursday, June 20, 2013, she had difficulty locating the defendant but eventually found him "in this situation that made me upset." Tr. 34—35. Once she located the defendant, they argued, and Ms. Wallace told the defendant he could not come back to her residence that night. Tr. 35—36. Ms. Wallace left the party and walked home alone. Tr. 36. When she got home, Ms. Wallace entered her home and locked the door so the defendant could not enter. Tr. 36—37. By this time, it was the early morning hours of Friday, June 21, 2013.

Approximately twenty minutes after Ms. Wallace had returned to her home and locked the door, the defendant arrived at 597 Sawyer

5

Street.  Tr. 37.  Ms. Wallace heard Mr. Shelton arrive, went outside, and told him that he could not come into her home.  Tr. 38.  Ms. Wallace then reentered her home and relocked the doors.  Id.  Mr. Shelton went to the front door of the residence and began speaking to Ms. Wallace "through the door."  Tr. 39.  According to Ms. Wallace, they talked "about the situation" Ms. Wallace had found the defendant in earlier in the evening.  Id.  Ms. Wallace again told the defendant he could not come in her home.  Id.  Instead of leaving, the defendant went to a front window and pulled the window up with enough force to break a security mechanism that limited the height that the window could be opened.  Tr. 40–41.  The defendant stepped through the window he had damaged and entered the home, and Mr. Shelton and Ms. Wallace continued to argue.  Tr. 41–43.  Eventually the defendant went upstairs alone and into Ms. Wallace's bedroom.  Tr. 43–44.  Ms. Wallace testified she did not give permission for the defendant to enter her home or go upstairs.  Id.

After the defendant went upstairs, Ms. Wallace called 911, but she did not say anything to the operator because she was afraid things "may just get all out of control" if the defendant knew she had called the police.  Tr. 45.  Ms. Wallace testified that previous arguments with the defendant "had turned physical," and she was afraid that would happen again.  Tr. 43, 45.  Once she heard the 911 operator on the line, Ms. Wallace deliberately hung up the phone and left it "off

6

the hook," knowing that 911 would trace the call and police would respond to her house.  Tr. 45—47.  Ms. Wallace went upstairs and saw the defendant had fallen asleep in her bed.  Tr. 47.  Shortly thereafter, members of the Rochester Police Department arrived, and Ms. Wallace told the responding officers that she did not want the defendant arrested but "just wanted him to leave for the night." Tr. 48.

Ms. Wallace allowed the officers into the residence and escorted them upstairs to her bedroom where the defendant was sleeping face down on his stomach.  Tr. 48—50.  She told the defendant that police had arrived and then went back downstairs.  Tr. 50—51.  A short time later, Ms. Wallace observed the defendant "fully dressed walking down the stairs."  Tr. 51.  Ms. Wallace testified that she then heard an officer upstairs yell something to the police officer who had come downstairs with the defendant, and the defendant was immediately handcuffed and taken into custody.  Tr. 52.  Ms. Wallace asked the officer why the defendant was being arrested but did not receive a response.  Tr. 53.  Ms. Wallace went outside and saw police officers taking pictures of a gun that had been placed on the trunk of a police car.  Id.  Ms. Wallace testified she was unaware that a firearm was in her home that night.  Tr. 54—55.  An officer asked Ms. Wallace if she would consent to a complete search of her home, and she agreed. Tr. 55.

The final witness at the hearing was the defendant's sister, Monica Shelton. Ms. Shelton was the only witness called by the defendant. She testified that her brother's mailing address was her home at 152 Hampton Boulevard, "but he often stayed with his children's mother" at 597 Sawyer Street. Tr. 102. In June of 2013, Ms. Shelton estimated that she would visit her brother at Sawyer Street three or four times a week. Id. Ms. Shelton stated that her brother and Ms. Wallace had fights where Ms. Wallace "kicked him out of the house." Tr. 110. Sometimes Ms. Shelton would have to pick up her brother and he would stay at her home until Ms. Wallace allowed the defendant to return to Sawyer Street. Tr. 110–11.

## Discussion

The law surrounding the concept of standing is well settled. "A defendant seeking to suppress the fruits of a search by reason of a violation of the Fourth Amendment must show that he had a legitimate expectation of privacy in the place searched." United States v. Hamilton, 538 F.3d 162, 167 (2d Cir. 2008) (internal quotation marks omitted). "This inquiry involves two distinct questions: first, whether the individual had a subjective expectation of privacy; and second, whether that expectation of privacy is one that society accepts as reasonable." Id. The burden is on the defendant to establish that he has standing to raise a Fourth Amendment

challenge to the search at issue.  See United States v. Osorio, 949 F.2d 38, 40 (2d Cir. 1991).  Often, "a defendant's property or possessory interest in the place searched" will establish a sufficient connection to the searched premises to establish standing.  United States v. Fields, 113 F.3d 313, 320 (2d Cir. 1997), cert. denied, Fields v. United States, 522 U.S. 976.  However, "a defendant's lack of such an interest does not rule out the possibility that he may still show a reasonable expectation of privacy."  Id.  So long as the defendant "*himself* exhibited an actual subjective expectation of privacy," and his privacy "expectation is one that society is willing to accept as reasonable," the defendant will be permitted to challenge a search.  Id. (emphasis in original); see also, e.g., Minnesota v. Olsen, 495 U.S. 91, 99 (1990) (invited houseguest has legitimate expectation of privacy); Fields, 113 F.3d at 320—21 (defendant, whose connection to searched premises was that he had permission from tenant to freely enter in order "to cook and to prepare crack cocaine for resale" had legitimate expectation of privacy in apartment); but see Minnesota v. Carter, 525 U.S. 83, 90—91 (1998) (defendant has no reasonable expectation of privacy in a home where he is an invited guest on premises strictly for commercial purposes).

While the test of standing may be easily and succinctly expressed in the two-part "expectation of privacy" inquiry, there are, of course, a myriad of facts that can impact the connection between a

defendant and a place searched by law enforcement.  The volatile "on again-off again" relationship between the defendant and Shanté Wallace requires the Court to analyze the defendant's expectation of privacy at a particular moment in time, specifically the early morning hours of June 21, 2013 when Ms. Wallace summoned the police to remove the defendant from her residence.

As to that particular time, the Court finds that the defendant has demonstrated that he had a subjective expectation of privacy in the 597 Sawyer Street residence.  Regardless of what the defendant may have represented on monthly supervision reports, he had a substantial and long-term connection to Ms. Wallace's Sawyer Street residence.  He regularly stayed at 597 Sawyer Street with Ms. Wallace's permission, his children resided at the residence, he received mail there, at one point in time Ms. Wallace had allowed him to have a key to her home, he paid for cable and internet service for the home, and his family and friends knew that he often stayed with Ms. Wallace at 597 Sawyer Street.

Where the defendant's standing argument fails, however, is in demonstrating that his subjective expectation of privacy was objectively reasonable at the time of the search.  Abundantly clear from the hearing testimony was that 597 Sawyer Street was Ms. Wallace's residence.  The lease was solely in Ms. Wallace's name, but more importantly, Ms. Wallace had the authority to exclude the defendant

10

from her home, and she regularly exercised that authority.  Indeed,
the hearing testimony paid tribute to the fact that the defendant
stayed at 597 Sawyer Street residence only when Ms. Wallace gave him
permission to stay there, and when she revoked that permission (and
"kicked him out"), the defendant left.  The hearing proof also
confirmed that the defendant knew that he was an invited guest at
597 Sawyer Street, and he recognized Ms. Wallace's authority to
exclude him from residing in her home.  It was Ms. Wallace's decision
whether the defendant could stay in her home or whether the defendant
had to live elsewhere, even if only for a few days.  When Ms. Wallace
told the defendant to leave her home, the hearing testimony confirmed
that he did so, often packing up clothing and other belongings and
moving to a family member's house until he was invited back as a guest
in Ms. Wallace's residence.  The defendant's sister, called by the
defendant at the hearing, confirmed that the defendant and Ms. Wallace
often had fights and she "kicked him out of the home" until she allowed
him to return to Sawyer Street.  That Ms. Wallace exercised her
authority to exclude the defendant with some regularity, and the
defendant complied with her directives, only serves to confirm that
the defendant recognized that his ability to reside at 597 Sawyer
Street was dependent on Ms. Wallace's permission to do so.  When that
permission was revoked, his status as a welcome guest ended.

    Mr. Shelton's prior recognition and acceptance of Ms. Wallace's

11

ability to decide who is and who is not welcome in her home stands in stark contrast to what happened during the early morning hours of June 21, 2013.  Informed that he was not welcome to return to Ms. Wallace's home that night, the defendant deliberately defied Ms. Wallace's directive. When the defendant arrived at 597 Sawyer Street, he found the front door locked, and then had a conversation with Ms. Wallace that further confirmed that he did not have permission to enter her residence.  Undeterred, the defendant gained entrance into 597 Sawyer Street by forcibly breaking a safety mechanism on a front porch window and climbing through the window into the residence.  His improper presence ended only when a fearful Shanté Wallace called the police to have Mr. Shelton involuntarily removed from her residence.

It was the defendant's burden to demonstrate at the hearing that his expectation of privacy in the place searched was "one that society willingly accepts as reasonable."  United States v. Paulino, 850 F.2d 93, 97 (2d Cir. 1988), cert. denied, Paulino v. United States, 490 U.S. 1052 (1989).  Mr. Shelton did not satisfy his burden.  Whatever subjective expectation of privacy the defendant had in 597 Sawyer Street, it was not a privacy interest that society would be willing to accept as objectively reasonable once he decided to defy Ms. Wallace and forcibly break into her home through the front window.  To be sure, there were many periods of time when the defendant would have had

12

a constitutionally sufficient expectation of privacy in Ms. Wallace's residence. However, as the hearing testimony confirmed, the defendant's privacy interests at 597 Sawyer Street were contingent on the decision of another person - Ms. Wallace. When the defendant broke into Ms. Wallace's residence in defiance of her demand that he not enter, his presence in the residence became wrongful, and any objectively reasonable expectation of privacy was extinguished. See, e.g., United States v. Battle, 637 F.3d 44, 49–50 (1st Cir. 2011), cert. denied, 132 S. Ct. 174 (defendant lacked standing where defendant was repeated overnight guest but tenant told defendant to leave residence and not come back); United States v. Aldred, 19 F. App'x 553, 554–55 (9th Cir. 2001) (defendant did not have reasonable expectation of privacy where defendant was occupant, not tenant, of premises, and permission to be an occupant had been revoked); United States v. Flowers, No. CR 01-271-BR, 2002 WL 31474175, at *3 (D. Or. Feb. 12, 2002) (defendant did not have standing to seek suppression of evidence where tenant "took back her key, threw out [defendant's] personal property, and effectively revoked her permission for [defendant] to come and go" from residence). Accordingly, it is my Report and Recommendation that the defendant's motion to suppress evidence be **denied** because the defendant lacks standing to contest the search of 597 Sawyer Street where the firearm was found and seized.

13

## Conclusion

For the foregoing reasons, it is my Report and Recommendation that defendant's motion to suppress evidence (Docket # 25) be **denied.** SO **ORDERED.**

_____/s/ Jonathan W. Feldman_____
JONATHAN W. FELDMAN
United States Magistrate Judge

Dated:    December 17, 2014
          Rochester, New York

14

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED**, that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within fourteen (14) days after receipt of a copy of this Report and Recommendation in accordance with the above statute and Rule 59(b)(2) of the Local Rules of Criminal Procedure for the Western District of New York.[2]

The district court will ordinarily refuse to consider on *de novo* review arguments, case law and/or evidentiary material which could have been, but was not, presented to the magistrate judge in the first instance. *See, e.g., Patterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985 (1st Cir. 1988).

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.** *Thomas v. Arn*, 474 U.S. 140 (1985); *Wesolek v. Canadair Ltd., et al.*, 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 59(b)(2) of the Local Rules of Criminal Procedure for the Western District of New York, "[w]ritten objections ... shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for each objection, and shall be supported by legal authority." **Failure to comply with the provisions of Rule 59(b)(2) may result in the District Court's refusal to consider the objection.**

Let the Clerk send a copy of this Order and a copy of the Report and Recommendation to the attorneys for the Plaintiff and the Defendant.

SO ORDERED.

_____/s/ Jonathan W. Feldman____
JONATHAN W. FELDMAN
United States Magistrate Judge

Dated:     December 17, 2014
           Rochester, New York

---

[2] Counsel is advised that a new period of excludable time pursuant to 18 U.S.C. § 3161(h)(1)(D) commences with the filing of this Report and Recommendation.   Such period of excludable delay lasts only until objections to this Report and Recommendation are filed or until the fourteen days allowed for filing objections has elapsed.   United States v. Andress, 943 F.2d 622 (6th Cir. 1991); United States v. Long, 900 F.2d 1270 (8th Cir. 1990).